In the Matter of the WELFARE OF the Child of J.W. and G.P., Parents.

No. A11–814.

Court of Appeals of Minnesota.

Nov. 28, 2011.

John E. Mack, New London, MN, for appellant J.W.

Jennifer K. Fischer, Kandiyohi County Attorney, Amy Isenor, Assistant County Attorney, Willmar, MN, for respondent Kandiyohi County Family Services.

Sarah Lynn Klaassen, Willmar, MN, for respondent G.P.

Kim Junkermeier, Lake Lillian, MN, guardian ad litem.

Considered and decided by JOHNSON, Chief Judge; BJORKMAN, Judge; and COLLINS, Judge.*

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

JOHNSON, Chief Judge.

Kandiyohi County petitioned to terminate J.W.'s parental rights to a newborn daughter, K.W., on the ground that J.W. is palpably unfit to be a party to a parent-child relationship. At trial, the county relied primarily on the statutory presumption that a parent is palpably unfit if his or her parental rights to one or more other children previously were involuntary terminated. J.W. introduced the testimony of 15 witnesses, including her own testimony, in an attempt to show that her parenting skills have improved such that she no longer is palpably unfit. But the district court determined that she did not rebut the presumption of palpable unfitness. On that basis, the district court granted the county's petition and terminated J.W.'s parental rights to K.W. We conclude that the district court erred because J.W. rebutted the statutory presumption of palpable unfitness by introducing evidence that would justify a finding that she is not palpably unfit. Therefore, we reverse and remand for further proceedings.

## FACTS

J.W. is a 33-year-old woman who, at the time of trial, lived in the city of Willmar. She has given birth to seven children since 1997. She has been married since November 2010.

Before this case was commenced, J.W.'s parental rights to other biological children were involuntarily terminated on two occasions. First, in 2007, Swift County petitioned to terminate J.W.'s parental rights to her four oldest children on the grounds that she was palpably unfit to parent, that she had neglected her parental duties, and

that reasonable efforts had failed to correct the conditions leading to the children's out-of-home placement. *See* Minn.Stat. § 260C.301, subd. 1(b)(2), (4), (5) (2006). In June 2007, that petition was granted, and J.W.'s parental rights to the four children were terminated. Second, in 2008, Swift County petitioned to terminate J.W.'s parental rights to her newly born fifth child on the ground that J.W. was palpably unfit to parent because her parental rights to her first four children had been involuntarily terminated in 2007. *See* Minn.Stat. § 260C.301, subd. 1(b)(4). In August 2008, that petition was granted, and J.W.'s parental rights to her fifth child were terminated. In addition, J.W. voluntarily terminated her parental rights to her sixth biological child in late 2009 in an open adoption.

J.W. became pregnant with K.W. in April 2010. She began dating E.W. during the summer of 2010, and they were married in November 2010. J.W. gave birth to K.W. on December 28, 2010. Two days later, Kandiyohi County petitioned to terminate J.W.'s parental rights to K.W., and the district court removed K.W. from J.W.'s care that same day by issuing an emergency protective-care order. On January 3, 2011, the district court appointed a guardian *ad litem* to represent K.W.

The district court held a four-day trial in March 2011. The county began by presenting two witnesses, both of whom are social workers with the Kandiyohi County Family Services department. The county's primary witness testified that J.W. had not made substantial changes in her life since the earlier termination-of-parental-rights (TPR) cases. The witness explained that J.W. has acted angrily while interacting with Family Services staff and other social service providers. The witness testified that J.W. was uncooperative during doctor visits in September 2009 and

December 2010. The witness also stated that J.W. has been dishonest with Family Services in the past. The county's other witness testified that the agency was unable to locate any suitable relatives with whom K.W. could be placed.

J.W. presented the testimony of 15 witnesses: two parenting-class teachers, four foster parents or adoptive parents of her other biological children, her husband, three additional adult family members, one friend from a bible-study group, two psychologists, a family-and-marriage therapist, and herself. Each of J.W.'s witnesses was cross-examined in ways that tended to limit the effect of their testimony. Nonetheless, J.W.'s evidence may be fairly summarized as follows.

In her own testimony, J.W. explained that her 2007 TPR was the result of a stressful period in her life when she was a single mother of four children, was unemployed, did not have access to a vehicle, and had little support from family and friends. J.W. testified that she has changed through her parenting classes and therapy sessions and has many more resources available to her now. She spoke of her marriage, the new support she enjoys from her husband and his family, and the renewed support she has received from her own family. J.W. testified that she and her husband rent an apartment and own two vehicles and that her living situation is more stable than at the times of the previous TPR proceedings. J.W. stated that she is now in a "positive place in my life" and is confident in her ability to parent K.W.

J.W.'s two parenting-class teachers testified that J.W. was a good student who attended class regularly, participated actively, and seemed to learn much. Both teachers had observed J.W. with children for whom J.W. was providing day-care services, and one teacher had observed J.W.

with two of her own biological children. Both teachers stated that J.W. demonstrated good behavior while interacting with the children. One of the teachers testified that she has no concerns regarding J.W.'s parenting skills and has no reason to believe that a child would be unsafe in J.W.'s care.

Four persons who are foster parents or adoptive parents of J.W.'s biological children testified to the improvements that J.W. has made in her lifestyle and anger-management issues. Each of the witnesses allows J.W. to have supervised visitation with his or her child. Two parents testified that J.W. and her children demonstrate mutual love for each other. Each of the parents testified to having no concerns over J.W.'s current treatment of children. Two of the parents testified that J.W.'s home now is very clean.

J.W. called members of her family to testify in her defense, and they generally testified that they are confident in J.W.'s parenting skills. J.W.'s sister had previously testified against J.W. during the 2007 TPR trial. But in 2011, she testified in support of J.W., stating that "she's a totally different person." The sister explained that she and her mother now can provide J.W. with much better family support than was possible during the period of the prior TPR proceedings. J.W.'s grandmother also testified against her in the 2007 trial, but when asked in 2011 if she had any concerns about J.W.'s parenting skills, the grandmother replied, "Absolutely none." J.W.'s husband, E.W., testified that he had participated in parenting classes with J.W., that he wants to help J.W. raise K.W., and that he currently holds a full-time job.

J.W.'s therapist testified that J.W. had made significant improvements in her ability to regulate her emotions and take responsibility for her actions since July 2010

through dialectical behavioral therapy. Dialectical behavioral therapy was ordered by the Swift County District Court in March 2006, prior to the first TPR order. J.W. also introduced a written report from a psychologist stating that "[c]urrent test results do not indicate the existence of any significant psychopathology."

After J.W. rested, the guardian *ad litem* testified that K.W. would be in danger if J.W. were to retain her parental rights. The guardian *ad litem* made several references to a 2006 mental-health evaluation, which documented J.W.'s anger-management issues. The guardian *ad litem* expressed concern that J.W. has a propensity to abuse children and might abuse K.W. if her parental rights were not terminated. She expressed concern that J.W.'s life might become difficult again with the responsibilities of 24-hour child care. The guardian *ad litem* testified that J.W. was arrested for giving a false name to a police officer; has six prior convictions for driving after cancellation, revocation, or suspension of her license; and has been involved in 12 harassment restraining orders as either a petitioner or a respondent. The district court record does not reflect when the arrest or the convictions and civil actions occurred.

In April 2011, the district court issued a 14-page order and memorandum. As one of its conclusions of law, the district court stated, "[J.W.] has failed to establish that her prospective fitness or capacity to parent should overcome the statutory presumption in favor of termination of her parental rights." The district court continued by stating, "Petitioner has established by clear and convincing evidence that there is a statutory basis to terminate [J.W.]'s parental rights because [J.W.]'s parental rights to her other children were involuntarily terminated in 2007 and 2008." On that basis, the district court granted

the county's petition and terminated J.W.'s parental rights to K.W. The district court did not make any findings of fact or conclusions of law as to whether the county had proved, independently of the statutory presumption, that J.W. is palpably unfit. J.W. appeals.

## ISSUE

Did J.W. rebut the statutory presumption of palpable unfitness in Minn.Stat. § 260C.301, subd. 1(b)(4) (2010), which is triggered by the existence of a previous involuntary termination of parental rights?

## ANALYSIS

J.W. argues that the district court erred by granting the county's petition and terminating her parental rights to K.W. More specifically, J.W. argues that the district court erred by determining that she did not rebut the statutory presumption that she is palpably unfit. We apply a *de novo* standard of review to the district court's decision to the extent that J.W.'s argument implicates matters of statutory interpretation. *In re Welfare of Child of T.P.*, 747 N.W.2d 356, 360 (Minn.2008).

### A.

■ A district court may terminate parental rights to a child if the district court finds that the parent

> is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn.Stat. § 260C.301, subd. 1(b)(4). The petitioning party bears the burden of proving palpable unfitness by clear and convincing evidence. Minn.Stat. § 260C.317, subd. 1 (2010); Minn. R. Juv. Prot. P. 39.04, subd. 2(a).

The second sentence of the above-quoted statute creates a presumption of palpable unfitness in some cases: "It is presumed that a parent is palpably unfit to be a party to the parent and child relationship upon a showing that the parent's parental rights to one or more other children were involuntarily terminated...." Minn.Stat. § 260C.301, subd. 1(b)(4). This presumption is a rebuttable presumption. *In re Welfare of Child of J.L.L.*, 801 N.W.2d 405, 412 (Minn.App.2011), *review denied* (Minn. July 28, 2011). The statutory presumption imposes on a parent " 'the burden of going forward with evidence to rebut or meet the presumption.' " *Id.* (quoting Minn. R. Evid. 301). The statutory presumption "does not shift to [a parent] the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." Minn. R. Evid. 301. Rather, the statutory presumption shifts to a parent a burden of production. *See id.*

To satisfy the burden of production, the parent "must produce evidence to rebut the assumed fact," or the presumption will require a finding or conclusion consistent with the presumption. Minn. R. Evid. 301, 1977 comm. cmt. More specifically, "If sufficient evidence is introduced that would justify a finding of fact contrary to the assumed fact the presumption is rebutted and has no further function at the trial." *Id.* Thus, to satisfy the burden of production and thereby rebut the presumption created by section 260C.301, subdivision 1(b)(4), a parent must introduce evidence that would "justify a finding of fact" that he or she is not palpably unfit. *See id.;*

see also *J.L.L.*, 801 N.W.2d at 412; *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn.App.2007), *review denied* (Minn. July 17, 2007). We apply a *de novo* standard of review to a district court's determination as to whether a parent's evidence is capable of justifying a finding in his or her favor at trial. *See DLH, Inc. v. Russ*, 566 N.W.2d 60, 69–71 (Minn.1997) (interpreting Minn. R. Civ. P. 56).

Whether a parent's evidence satisfies the burden of production must be determined on a case-by-case basis. The burden often is a difficult one. This court has stated that "a parent must do more than engage in services" and "must demonstrate that his or her parenting abilities have improved." *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 545 (Minn.App. 2009). We also have stated that "a parent must affirmatively and actively demonstrate her or his ability to successfully parent a child." *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 251 (Minn.App. 2003). We elaborated on this requirement by stating, "To shoulder this burden, the parent ... is inevitably required to marshal any available community resources to develop a plan and accomplish results that demonstrate the parent's fitness." *Id.*

 Furthermore, whether a parent has rebutted the statutory presumption depends in part on whether a parent has presented evidence of his or her current circumstances. A decision to terminate parental rights must be based on the "conditions that exist at the time of termination and it must appear that the conditions giving rise to the termination will continue for a prolonged, indeterminate period." *In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn.2001). When considering petitions to terminate parental rights, a district court should rely " 'not primarily on past history, but to a great extent upon the projected permanency of the parent's ina-

bility to care for his or her child.' " *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn.1996) (quoting *In re Welfare of A.D.*, 535 N.W.2d 643, 649 (Minn.1995)) (quotation omitted). Termination on the ground of palpable unfitness requires a petitioner to prove "specific conditions existing at the time of the hearing that appear will continue for a prolonged, indefinite period and that are permanently detrimental to the welfare of the child." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 661 (Minn.2008) (quoting *In re Welfare of M.D.O.*, 462 N.W.2d 370, 377 (Minn.1990)).

**B.**

In this case, J.W. introduced her own testimony and the testimony of 14 other witnesses. The general thrust of J.W.'s evidence is that she has changed in significant and material ways since the prior TPR proceedings. Most relevant to her ability to be an adequate parent is her evidence that she has made significant progress in her parenting skills through parenting classes and dialectical behavioral therapy. One instructor of the parenting class testified that J.W. is "involved and active" and has learned much from the classes. J.W. also introduced evidence that she has conducted herself appropriately when engaging in supervised visits of her biological children, whose foster parents and adoptive parents support J.W.'s defense of the county's petition. J.W. also presented evidence of a more stable living environment than in the past; she lives with her husband, who has a full-time job, and they have two vehicles. And J.W.'s relatives testified that she now can expect a greater support network than she previously enjoyed. J.W.'s evidence was appropriately focused on her skills and behavioral tendencies at the time of the trial. *See T.R.*, 750 N.W.2d at 661; *P.R.L.*, 622 N.W.2d at 543; *S.Z.*, 547 N.W.2d at 893.

This evidence, if believed, would "justify a finding contrary to the assumed fact" that J.W. is palpably unfit. *See* Minn. R. Evid. 301, 1977 comm. cmt. Her evidence tends to prove that she has done more than merely engage in services provided by the county or a private social-service agency, and it tends to prove that her parenting skills actually have improved. *See D.L.D.*, 771 N.W.2d at 545. Her evidence tends to "affirmatively and actively demonstrate her ... ability to successfully parent a child" and to indicate that she has "marshal[ed] ... available community resources to develop a plan and accomplish results that demonstrate [her] fitness." *D.L.R.D.*, 656 N.W.2d at 251. Accordingly, J.W. has rebutted the statutory presumption of palpable unfitness. The presumption shall have no further role. *See* Minn. R. Evid. 301, 1977 comm. cmt. The burden of persuasion remains with the county to prove, by clear and convincing evidence, that "specific conditions existing at the time of the hearing" make J.W. palpably unfit to be a parent. *T.R.*, 750 N.W.2d at 661.

In its April 2011 order and memorandum, the district court erroneously concluded that the statutory presumption remained intact. It is unclear whether the district court applied a burden of production or a burden of persuasion when it concluded that J.W. "has failed to establish that her prospective fitness or capacity to parent should overcome the statutory presumption in favor of termination of her parental rights." In any event, J.W.'s evidence is sufficient to rebut the presumption of palpable unfitness. Having rested its decision on the statutory presumption, the district court did not make any findings or conclusions as to whether the county satisfied its burden of persuasion on the issue of palpable unfitness. *See* Minn.Stat. § 260C.301, subd. 1(b)(4). Accordingly, we remand the case to the district court for further proceedings.

## DECISION

J.W. introduced evidence that would justify a finding that she is not palpably unfit. Thus, she has rebutted the statutory presumption of palpable unfitness in section 260C.301, subdivision 1(b)(4), of the Minnesota Statutes. Therefore, we reverse the district court's order terminating J.W.'s parental rights to K.W. and remand the case to the district court for further proceedings not inconsistent with this opinion.

**Reversed and remanded.**