*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1560**

In the Matter of the Welfare of the Child of: A.N.T. and J.W., Parents

**Filed April 20, 2015
Affirmed
Rodenberg, Judge**

Olmsted County District Court
File No. 55-JV-14-174

Kristi A. Fox, Eagan, Minnesota (for appellant A.N.T.)

Frederick S. Suhler, Jr.., Rochester, Minnesota (for respondent J.W.)

Thomas J. Nolan, Jr., Nolan Law Offices, Minneapolis, Minnesota (for respondent Eric Brekke)

Debra A. Groehler, Assistant County Attorney, Rochester, Minnesota (for respondent Olmsted County)

Considered and decided by Smith, Presiding Judge; Rodenberg, Judge; and Chutich, Judge.

## UNPUBLISHED OPINION

**RODENBERG**, Judge

Appellant-mother challenges the district court's termination of her parental rights. We affirm.

# FACTS

Appellant A.N.T. (mother) has three children. Mother's parental rights to C.L. and L.L. (the boys) were involuntarily terminated on October 31, 2013. A little over a month later, on December 5, 2013, mother gave birth to her third child, K.N.W. (daughter), who is the subject of the termination of parental rights (TPR) petition involved in this appeal. J.W. (father) was adjudicated the father of daughter on April 7, 2014, and he voluntarily terminated his parental rights to daughter on the first day of trial, June 23, 2014. He makes no appearance on appeal.

In the first TPR proceeding, relating to the boys, the district court found that reasonable efforts by social services had failed to correct the conditions which led to out-of-home placement of the boys, and it therefore terminated mother's parental rights pursuant to Minn. Stat. § 260C.301, subd. 1(b)(5) (2012). *In re Welfare of Children of A.N.T.*, No. A13-2134, 2014 WL 1408089, at *2 (Minn. App. Apr. 14, 2014) ("*A.N.T. I*"). The boys had been placed out-of-home because (1) they had been left in the care of strangers/unsafe individuals, (2) mother and other caregivers were using chemicals, (3) mother failed to provide the boys appropriate educational and medical services, and (4) mother failed to manage her own mental and physical health, which resulted in neglect of the boys. *Id.* at *1. The district court found that these conditions leading to out-of-home placement had persisted despite reasonable efforts by social services. *Id.* at *2. Mother had failed to address her own physical and mental health needs, which the district court found led to "repeated trips to the emergency room, missed visits with [the boys], the loss of electricity [and] the loss of [mother's] apartment." *Id.* Mother

2

appealed and we concluded that these findings were supported by the record. *Id.* We ultimately reversed and remanded because the district court had failed to make adequate best-interests findings. *A.N.T. I*, 2014 WL 1408089, at *3. We remanded to the district court to address this narrow issue. *Id.*; *see also In re Welfare of Children of A.N.T.*, No. A14-0925, 2014 WL 5125448, at *1, *4 (Minn. App. Oct. 14, 2014) ("*A.N.T. II*") (affirming district court's best-interests findings on appeal).

Before mother gave birth to daughter, Olmstead County Community Services (OCCS) had told mother how the previous involuntary TPR would affect her parental rights to daughter. *See* Minn. Stat. § 260C.301, subd. 1(b)(4) (2012) (presuming parent is palpably unfit when there is a previous involuntary termination). OCCS attempted to find family members to provide foster care for daughter, but those efforts ultimately failed. One of the family options for foster care was unavailable because of an impending move but suggested that foster parents A.S. and M.S. be allowed to adopt daughter.[1] OCCS determined that the foster parents were a viable placement option.

Mother and father met the foster parents before daughter's birth. At the end of the meeting, mother hugged the foster mother. Once daughter was born, mother and father executed a Voluntary Placement Agreement (VPA) and daughter was placed with the foster parents on December 8, 2013. Mother requested that she be able to hand daughter to the foster parents once daughter was born, and OCCS honored that request.

---

[1] There were other family options explored but the other options are not germane to this appeal.

3

On January 2, 2014, OCCS filed a petition to terminate the parental rights of both parents to daughter. OCCS arranged visitation for mother and father, once per week for mother and three times per week for father. Although mother requested to have her visitation increased, OCCS did not increase visitations with mother because of the earlier TPR and OCCS's belief that mother's situation had not substantially changed.

In mid-January, the foster mother began noticing issues with daughter, including difficulty feeding and gaining weight. She had poor muscle tone in her neck and favored positioning her head to the right. Daughter was diagnosed with hypotonia, which is indicative of weak muscle tone, and was described as "a rag doll effect." Due to daughter's developing significant medical needs, visitations with mother ceased in February, although mother was allowed to attend all of daughter's medical appointments.

An admit/deny hearing on the TPR petition concerning daughter was held at the end of January. The district court denied what it construed as mother's request to "reschedule the trial pending the decision of the appellate court on the previous TPR."

Daughter's medical situation became more complicated. At the time of trial, daughter could not sit up on her own, even though she was just over 6 months old. Daughter was not gaining weight, would not signal that she was hungry, and would not eat. The foster parents worked with medical providers to get daughter to consume more calories, but her weight continued to drop. Eventually, daughter needed an NG tube, a temporary feeding tube, placed to force feedings. Daughter continued to lose weight even after the NG tube was placed, and required a more permanent tube, a "G-tube," surgically placed just before trial in May.

Daughter was eventually deemed to be developmentally delayed in several ways. Her cognitive development, physical development, and communication development were delayed, and her motor skills were far below average.

At six months, daughter weighed only 11 pounds. Due to daughter's medical needs, the foster mother left her job to attend to daughter full-time. At the time of trial, daughter was still not feeding without the G-tube. The foster father testified that he and his wife allow daughter to attempt drinking from a bottle "roughly every four hours," including overnight. If daughter does not finish the bottle in 20 minutes, they must "push" the rest of the contents of the bottle through daughter's G-tube. The foster father estimated that about half of the feedings needed to be "pushed" through daughter's G-tube.

The foster parents were also administering physical therapy to daughter three to five times a day. They noticed "pauses" in daughter's breathing that required them to purchase a Crib Alert which alerts them if daughter has not moved. Daughter is unable to be placed in normal child care and requires constant care and supervision.

It was during this time that we heard mother's appeal in *A.N.T. I*. We affirmed the district court's determination that mother's rights should be terminated pursuant to Minn. Stat. § 260C.301, subd. 1(b)(5), but reversed and remanded for further findings concerning the best-interests factors. *A.N.T. I*, 2014 WL 1408089, at *2-3. The district court presiding at mother's TPR trial concerning the boys made additional findings on these factors and again determined that TPR was in the boys' best interests and again terminated mother's rights. *A.N.T. II*, 2014 WL 5125448, at *1. Before the trial

5

concerning daughter, mother had again appealed the district court's decision in her first TPR (*A.N.T. II*) and that appeal was pending at the time of the trial in this case.

Mother also raised an issue to the district court in this case concerning whether the Indian Child Welfare Act (ICWA) applied. Mother claimed Indian heritage, but is not a member of any tribe. Ultimately, the district court held that ICWA did not apply.

The district court applied the presumption set forth in Minn. Stat. § 260C.301, subd. 1(b)(4) because of the earlier TPR. It found that mother did not present evidence at trial sufficient to rebut the presumption of palpable unfitness, and that mother had not sufficiently changed since her first TPR to provide care for daughter. The district court terminated mother's rights under Minn. Stat. § 260C.301, subd. 1(b)(4), concluding that mother is palpably unfit to be a party to the parent-child relationship, and that termination of Mother's parental rights was in the best interest of daughter. This appeal followed.

**D E C I S I O N**

**I.    Indian Child Welfare Act**

ICWA protects Native American children from "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 1600 (1989). ICWA provides procedural safeguards and substantive requirements in cases concerning the custody of Native American children. *Id.* at 36, 109 S. Ct. 1602. The district court must apply the mandates of ICWA if the proceeding is a "child custody proceeding," and if the child is an "Indian child," as those terms are defined by ICWA.

6

*In re Best Interests of M.R.P.-C.*, 794 N.W.2d 373, 378 (Minn. App. 2011). Whether the district court erred by declining to follow ICWA procedures is a question of law that we review de novo. *See In re Welfare of S.N.R.*, 617 N.W.2d 77, 81 (Minn. App. 2000) (holding that the district court's determination that a child was an "Indian child" is a question of law reviewed de novo).

An action to terminate parental rights is one of the enumerated proceedings considered a "child custody proceeding" under ICWA. 25 U.S.C. § 1903(1)(ii) (2014). An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* (4). It is undisputed that neither daughter, nor either of the parents are members of an Indian tribe.

In *In re M.R.P.-C.*, we held that "a district court has an affirmative obligation to inquire into whether ICWA applies to a custody determination when it has reason to believe that the child subject to the determination is an Indian child." 794 N.W.2d at 379. The district court in this case had some indication that daughter may be an Indian child. The OCCS Child Protection worker had mother sign both a "traditional" VPA as well as a VPA for an Indian Child, because "[father] had informed [the child protection worker] that he may have some Indian heritage on his great-great-great-great grandmother's side." Mother's trial counsel also raised the issue to the district court at the admit/deny hearing and again on the first day of trial. There was also extensive testimony given by mother's

mother about her Native American spiritual practices and involvement in various Native American communities.[2]

The district court properly inquired into whether ICWA applies here. After extensive testimony, the district court's reopening of the ICWA issue, and dozens of tribal notifications, including one to the United States Bureau of Indian Affairs, no evidence was located to suggest that daughter is eligible for membership in any Indian tribe. Mother, through her mother, provided scant information pertaining only to practices and purported Native American heritage, but nothing concerning tribal membership or eligibility for membership. OCCS, despite extensive and documented efforts, was unable to verify that daughter is an Indian Child as defined by ICWA.

We have held that a district court does not err when it declines to apply ICWA where "there is no evidence that the children are eligible for membership in any Indian tribe." *In re Welfare of Children of M.L.A.*, 730 N.W.2d 54, 59 (Minn. App. 2007). Further, in *In re Matter of Baby Boy Doe*, 849 P.2d 925, 931 (Idaho 1993), *cert. denied* 510 U.S. 860, 114 S. Ct. 173 (1993), the Idaho Supreme Court held that "[t]he party asserting the applicability of ICWA has the burden of producing the necessary evidence for the trial court to make" the determination of whether ICWA applies.

Mother failed to meet her burden of production concerning the application of ICWA. Therefore, the district court did not err in concluding that ICWA does not apply here.

---

[2] It is undisputed that mother's mother is not a member of an Indian tribe.

## II. Voluntary Placement Agreement

Mother argues that her signing of the VPA was invalid and unconstitutionally coerced. We see no merit to her contention. The OCCS worker had discussed the VPA with mother before daughter's birth. Mother had signed an earlier VPA concerning the boys. Mother cites no authority suggesting that OCCS (which, in an abundance of caution, obtained two separate VPAs for the placement of daughter, one compliant with ICWA and the other appropriate for non-ICWA cases) erred concerning the VPA. And, in any event, had mother not signed the VPA, OCCS had the authority to take emergency protective custody of the child. *See* Minn. R. Juv. Prot. P. 28.02, subd. 1(b) (allowing for emergency protective care to be assumed by social services if there is prima facie evidence that the child's welfare is at risk). Moreover, shortly after the VPA was signed, the district court ordered that OCCS would have emergency protective care of daughter, rendering the VPA insignificant thereafter. The circumstances surrounding the signing of the VPA appear to have been lawful and, in any event, have no bearing on the disposition of this appeal.

## III. Rebuttable Presumption of Palpable Unfitness

### a. Proceeding with a presumptive TPR when the initial TPR giving rise to the presumption is on appeal

Ordinarily, the fitness of a natural parent to care for his or her own child is presumed. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 250 (Minn. App. 2003). However, parental rights may be terminated if a district court finds by clear and convincing evidence that the parent is palpably unfit to be a party to the parent and child

relationship. Minn. Stat. § 260C.301, subd. 1(b)(4). And a parent is presumed palpably unfit if that parent has had parental rights involuntarily terminated in a previous proceeding. *Id.*

Mother argues that "pending appellate cases" deprive the district court of "jurisdiction" to proceed with a newly filed TPR proceeding as a presumptive TPR. When OCCS petitioned for the termination of parental rights to daughter in January 2014, it did so pursuant to the presumption of palpable unfitness in subdivision 1(b)(4). At that time, mother's rights had been terminated and she had taken an appeal that had not been heard or decided. By the time the district court terminated mother's parental rights to daughter, on August 20, 2014, we had reversed and remanded the earlier TPR for further findings concerning best interests, the district court had made those additional findings, and had again concluded that mother's parental rights to the boys should be terminated. Mother appealed again and, two months after the district court terminated mother's parental rights to daughter, we affirmed the district court's decision from the first TPR in *A.N.T. II*.

"The service and filing of a notice of appeal does not stay the order of the juvenile court. The order of the juvenile court shall stand pending the determination of the appeal" absent the grant of a motion to stay. Minn. R. Juv. Prot. P. 47.03. Mother asked the district court to continue the proceedings concerning daughter until the resolution of the appeal in *A.N.T. I*. But she did not move the district court for a stay of the TPR proceedings during the appeal. And we denied a request to stay on November 25, 2014.

10

Therefore, under rule 47.03, the district court properly applied the presumption of palpable unfitness.

### b. Rebutting the presumption

Once the presumption of palpable unfitness applies, the parent has the burden to rebut that presumption. *In re D.L.R.D.*, 656 N.W.2d at 250. "The statutory presumption imposes on a parent the burden of going forward with evidence to rebut . . . the presumption [but it] does not shift . . . the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party" petitioning to terminate parental rights. *In re Welfare of Child of J.W.*, 807 N.W.2d 441, 445 (Minn. App. 2011) (quotation and citations omitted).

In *In re J.W.*, we reversed the district court's determination that the parent failed to overcome the presumption because the parent produced evidence which "if believed, would justify a finding contrary to the assumed fact that [the parent] is palpably unfit." *Id.* at 447 (quotation omitted). And the Minnesota Supreme Court recently noted that the presumption of palpable unfitness is "easily rebuttable." *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 137 (Minn. 2014).

In its conclusions of law, the district court correctly identified that the statutory presumption of parental unfitness places the burden of production on the parent. The district court concluded that mother did not rebut this presumption. The district court reasoned, "[mother] failed to present evidence of her current circumstances that affirmatively and actively demonstrate her parenting ability has improved . . . [and] she failed to demonstrate that she can affirmatively and actively successfully parent her

child." The district court found that "[t]he evidence in the record overwhelmingly supports that mother's circumstances have not substantially improved since her first termination of parental rights." The district court found that, like in the first TPR, mother still had difficulty managing her medical needs, she has been unable to obtain stable housing, and "is incapable of maintaining consistent employment." These findings are similar to the findings made by the district court in the first TPR and are supported by the record before us.

Mother argues that the evidence presented at trial was sufficient to rebut the presumption.[3] Mother points to her own testimony that, since the first TPR, she is better able to manage her own physical and mental health, she has stopped associating with people who use illegal substances, she had maintained employment before her move to Kasson, and her move to Kasson was an improvement in her housing situation. Mother further testified that her sister, who lives near her, would be willing to care for daughter and is trained in administering feedings through a G-tube. Mother also testified that her own previous employment as a "home health aid[e]" gave her training on administering feedings through a G-tube. Mother presented testimony of medical professionals who

---

[3] Among the other arguments discussed *infra*, mother argues that she met her burden because "all parties stipulated [that mother's] drug usage was not an issue . . . despite *being the basis* for the initial TPR." (Emphasis added.) Mother mischaracterizes the *basis* upon which her parental rights to the boys were terminated. In the first TPR the district court cited mother's failure to provide appropriate educational and medical care to the boys, her failure to manage her mental and physical health, repeated trips to the emergency room, inability to find stable housing and employment, and mother's inability to understand the realistic needs of the boys. *A.N.T. II*, 2014 WL 5125448, at *2-3. While drug use was apparently one of *mother's* identified problems in the earlier case, the essence of that case, as in all child-welfare cases, was the effect of the identified problems on the involved children.

testified that mother's ability to care for her own physical and mental health needs had improved. Mother also presented her mother's testimony supporting her own testimony that mother had recently moved, that the move was good, and that mother recently lost her job.

Even if we consider only the aspects of the medical providers' testimony most favorable to mother, the medical providers had no knowledge of whether mother had continued to appropriately control her diabetes at the time of trial. None of them had been in contact with mother for at least six months. *See In re J.W.*, 807 N.W.2d at 446 (stating that "whether a parent has rebutted the statutory presumption depends . . . on whether a parent has *presented evidence of his or her current circumstances* . . . and [a] decision to terminate parental rights must be based on the conditions that *exist at the time of termination*" (quotation omitted, emphasis added)). And the testimony of mother's mother did not add anything beyond confirmation of mother's testimony, which the district court found to be insufficient to overcome the presumption.

Mother admitted that she was not gainfully employed as of the trial because she left a paying job shortly before trial in order to move to Kasson. While she testified that her roommate in Kasson would allow her to reside with him permanently, she admitted she would still have to "get a different place" because of the lack of space in that residence. Mother testified that she has not had stable housing for two years. She also admitted that she had been to the emergency room between 15 and 20 times in the six months before trial.

Accepting mother's testimony as true, we see no error in the district court's conclusion that mother failed to overcome the presumption of unfitness. Mother's testimony largely confirms that her situation remained unchanged from her first TPR. And the district court correctly noted that daughter requires more extensive parenting skills than did the boys. The record supports the district court's finding that mother failed to rebut the presumption.

Even examining the district court's findings and conclusions without regard to the statutory presumption, those findings are not clearly erroneous and are sufficient to support a conclusion that mother is palpably unfit to be party to the parent-child relationship. *See In re Welfare of Child of J.L.L.*, 801 N.W.2d 405, 410 (Minn. App. 2011) (stating findings are not clearly erroneous if supported by the evidence as a whole). Parental rights may be terminated if the parent is palpably unfit to be a party to the parent-child relationship because of "specific conditions directly relating to the parent and child relationship . . . determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing . . . needs of the child." Minn. Stat. § 260C.301, subd. 1(b)(4).

The district court found that mother "has not demonstrated that she can maintain stable, safe housing" and that mother is "incapable of maintaining consistent employment to provide for her basic needs, much less [daughter's] extensive special needs." Further, the district court found that mother "continues to experience difficulties managing her own physical and mental health needs." The district court found that "[t]he protection concerns that were present in [the first TPR] are present here: lack of stability, lack of

14

safe housing for [daughter], underemployment, and inability to manage medical needs on a consistent basis."

These findings are supported by the record and are not clearly erroneous. The record supports the finding, even without reference to the presumption, that mother is unable "to care appropriately for the ongoing . . . needs of the child" and will be unable to do so into the reasonably foreseeable future. *See* Minn. Stat. § 260C.301, subd. 1(b)(4); *see also In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 92 (Minn. App. 2012) (concluding that the district court "properly took into account [the child's] uniquely demanding medical needs" when it held that the parent in that case was palpably unfit "to meet [the child's] extraordinary needs.").

## IV. Best Interests of the Child

Mother further argues that "Minnesota case[s] lack[] definitive guidelines as to what specificity the district courts are supposed to exercise in their particularized findings" concerning the best interests of the child. She posits that we should adopt Michigan's model concerning best interests.

It is not our proper role to make new law. *Tereault v. Palmer*, 413 N.W.2d 283, 286 (Minn. App. 1987) (stating that "the task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court"), *review denied* (Minn. Dec. 18, 1987). Mother does not appear to argue that, under existing law, the district court's best-interests analysis is improper. The district court made particularized findings on why it was in daughter's best interests for mother's parental rights to be terminated under established Minnesota law. The record supports those findings. Whether the best-

15

interests analysis would have proceeded differently under the law of the State of Michigan, or of any other jurisdiction, is not our proper concern.

In sum, the district court did not err in determining that ICWA does not apply, and mother has demonstrated neither error nor prejudice concerning the VPA she signed. The district court properly applied the statutory presumption of palpable unfitness and did not err in concluding that mother had failed to rebut the presumption. The record supports the district court's determinations that mother is palpably unfit and that termination of mother's parental rights is in daughter's best interests.

**Affirmed.**