*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0911**

In the Matter of the Welfare of the Child of: K. C. T. and L. L. T., Parents

**Filed November 7, 2016
Affirmed
Larkin, Judge**

McLeod County District Court
File No. 43-JV-16-22

Scott L. Nokes, Glencoe Law Office, Glencoe, Minnesota (for appellant mother)

Michael Junge, McLeod County Attorney, Amy E. Olson, Assistant County Attorney, Glencoe, Minnesota (for respondent McLeod County)

Dawn Mitchell, Hutchinson, Minnesota (guardian ad litem)

Considered and decided by Peterson, Presiding Judge; Larkin, Judge; and Kirk, Judge.

**UNPUBLISHED OPINION**

**LARKIN**, Judge

Appellant-mother challenges the district court's termination of her parental rights (TPR), arguing that she rebutted the statutory presumption that she is palpably unfit and

that the district court had a duty to provide her a meaningful opportunity to demonstrate that she could parent her infant child. We affirm.

## FACTS

This appeal stems from the district court's order terminating the parental rights of appellant K.C.T. (mother) and L.L.T. (father) to their biological child, T.T., in May 2016. The district court previously involuntarily terminated the parents' parental rights to seven other children in February 2015.

In the prior TPR proceeding, the district court held a three-day trial and made multiple findings in support of its TPR order. For example, the district court found that mother and father did not provide adequate shelter for the children. Raw sewage had backed up in the basement of the parents' home in Glencoe, where the children resided. In the basement, standing water containing feces and clothing stood four to six inches deep. In other areas of the home, electrical wiring was exposed, and space heaters were plugged in next to beds and clothing. The home did not contain smoke detectors, and the door of the oven was broken and detached from the appliance. Feces, mold, and cockroaches were present throughout the parent's home in Glencoe. After the children were placed in foster care, an arthropod nymph (most likely a cockroach) was found in one of the children's ears. A doctor had to remove the insect from the child's ear.

The district court also found that mother and father did not provide adequate clothing for the children, as evidenced by one of the children's frostbitten feet. Mother and father did not address and obtain appropriate medical care for six of the children's growth issues, one child's frostbite, and another child's abscessed tooth. Mother and father did

2

not provide the children with necessary food or nutrition. One of the children told a social worker that he liked foster care because he did not have to worry when he ate, explaining that "[a]t home, cockroaches would fly in, and mom and dad could eat the food, but I couldn't. And if I couldn't find like, a granola bar or a bag of chips, I just waited till the next day and ate at school."

The district court found that when the children were removed from their parents' care, six of the children had growth delays, five of the children had microcephaly (an abnormally small head), and four of the children had dental issues. Initial genetic testing indicated that the children's growth issues did not have a genetic origin. The youngest child initially had growth delays but quickly rebounded in foster placement. The district court found that the oldest child was diagnosed with adjustment disorder with anxiety, the second oldest child was diagnosed with adjustment disorder with mixed anxiety and depressed mood, the third oldest child was diagnosed with mixed anxiety and depressed mood, the fourth oldest child was diagnosed with adjustment disorder with anxiety and attention deficit hyperactivity disorder (ADHD), and the fifth oldest child was diagnosed with reactive attachment disorder. The district court found that four of the children had cognitive or developmental delays.

The district court found that McLeod County Social Services (the county) provided numerous financial, medical, educational, and other services to mother, father, and the children during a 12-month period. These services included over 95 hours of parenting education and home-management services to address nutrition, hygiene, and finances; over nine months of tutoring and skills-worker services provided both at home and at school;

3

supervised visitation in three different settings; family assessment and case management; speech services for the children; early childhood special education; family group decision-making; medical and dental care; gas cards; payments for meals and food assistance; and referrals to community organizations. The district court determined that the scope, nature, and extent of the county's exhaustive rehabilitative and reunification efforts were reasonably calculated to address the many child-protection issues.

The district court found that despite those services, mother and father failed to improve their parenting abilities. Specifically, the parenting educator credibly testified that the parents were unable to learn and implement new parenting skills even though they had received 95 hours of parenting education. The children's behavior, manners, and respect for others all regressed when the children visited their parents on weekends. In addition, mother and father did not demonstrate that they could budget their income to meet the needs of a family of nine, that they could keep their home clean and organized, or that they could ensure appropriate supervision for the children.

Approximately two months after the district court involuntarily terminated mother's and father's parental right to their seven children, mother and father conceived T.T., who was born on February 9, 2016. T.T. was placed on a 72 hour health-and-welfare hold after his birth. On February 10, the county filed a petition seeking to terminate mother's and father's parental rights to T.T. on the grounds that mother and father "are palpably unfit, as presumed by a previous involuntary termination of their parental rights." The district court placed T.T. in out-of-home placement pending an emergency-protective-care hearing. The district court held an initial emergency-protective-care hearing on February

11 and a contested emergency-protective-care hearing on February 16. After the hearings, the district court ordered that T.T. remain in out-of-home placement and granted mother and father one supervised visit up to two hours per week with T.T. at a Visitation Exchange Center (VEC).

Mother and father denied the allegations in the TPR petition. Following the admit/deny hearing, the district court found that the county was relieved of its legal obligation to provide reasonable reunification efforts based on the prior involuntary TPR.

On May 5 and 6, the district court held a trial on the TPR petition regarding T.T. At trial, the county's counsel asked mother what she "failed to do right the first time with the seven kids." Mother testified that "[w]e didn't have the cleanest house on the block," there "were cockroaches in the house," there were structural problems with their home because it was an older home, and there were issues with boundaries or discipline. The county's counsel provided mother with pictures of the house in Glencoe and asked mother how she thought living in the house affected her children. Mother responded, "I don't know because we don't get to speak to them." When the county's counsel questioned mother further, mother testified that the children "were doing good in school, and they did eat." She testified that they "had food in the cupboards and provided food" and that the children "had shelter." Mother testified that the city was responsible for the sewage in the basement of the Glencoe home.

The guardian ad litem asked mother why several of her children had been labeled "failure to thrive." Mother testified, "I guess they said—well, we asked that once, Well, what does this mean, you know? Because we—we did feed them." Counsel for the county

asked mother if it was her "belief that [her] previous children's failure to grow issues were not caused by either lack of food or their home environment." Mother testified, "Well, I don't—I mean—I mean, yes, the house was messy. I mean, when you have kids, it's going to be messy. I mean, we did clean up, but—." The county's counsel asked mother if she believed she caused her children's failure to grow. Mother replied, "I think—I don't think so. I mean, part of it has to do with the genetics. And we didn't get any updates on those appointments or anything."

The district court terminated mother's and father's parental rights to T.T. The district court determined that "[t]he evidence at trial showed clearly and convincingly that [mother and father] are palpably unfit to parent [T.T.]." The district court also determined that "[t]he evidence at trial overwhelmingly supports a finding that it is in [T.T.'s] best interests" to enjoy "a permanent, stable, safe, loving and nurturing family and home with his seven bio siblings, [his foster parents' children] and [his foster parents]." Mother appeals.

## D E C I S I O N

"Parental rights are terminated only for grave and weighty reasons." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn. 1990). A district court's decision in a termination proceeding must be based on evidence concerning the conditions that exist at the time of trial. *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007), *review denied* (Minn. July 17, 2007). An appellate court "exercises great caution in termination proceedings, finding such action proper only when the evidence clearly mandates such a result." *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996).

6

On appeal, this court examines the record to determine whether the district court applied the appropriate statutory criteria and made findings that are not clearly erroneous. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). "A finding is clearly erroneous if it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). "[A] district court's findings in support of any TPR order must address the best-interests criterion."[1] *In re Welfare of the Child of D.L.D.*, 771 N.W.2d 538, 546 (Minn. App. 2009); *see* Minn. Stat. § 260C.301, subd. 7 (2014) ("[T]he best interests of the child must be the paramount consideration . . . ."). This court gives the district court's decision to terminate parental rights considerable deference but "closely inquire[s] into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008).

**I.**

A district court may terminate parental rights to a child if the district court finds that the parent

> is palpably unfit to be party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn. Stat. § 260C.301, subd. 1(b)(4) (2014).

---

[1] Mother does not assign error to the district court's best-interest finding.

"It is presumed that a parent is palpably unfit to be a party to the parent and child relationship upon a showing that the parent's parental rights to one or more other children were involuntarily terminated . . . ." *Id.* Where a parent's parental rights to one or more other children were involuntarily terminated, the parent has the burden of rebutting the presumption of palpable unfitness. *T.D.*, 731 N.W.2d at 554. "[A] parent rebuts the presumption by introducing evidence that would justify a finding of fact that the parent is not palpably unfit, and whether the evidence satisfies the burden of production is determined on a case-by-case basis." *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 137 (Minn. 2014) (quotations omitted). This court reviews a district court's determination that a parent has failed to rebut the palpable-unfitness presumption to determine whether it is supported by substantial evidence and is not clearly erroneous. *D.L.D.*, 771 N.W.2d at 544.

A social-services agency need not make reasonable efforts to prevent the out-of-home placement of a child, rehabilitate the child's parent, or reunify the parent and child where the district court determines that the agency has made a prima facie case that "the parental rights of the parent to another child have been terminated involuntarily." Minn. Stat. § 260.012(a)(2) (2014). In such cases, "the parent, with the assistance of counsel, is inevitably required to marshal any available community resources to develop a plan and accomplish results that demonstrate the parent's fitness." *D.L.R.D.*, 656 N.W.2d at 251.

Mother argues that she "reasonably rebutted the presumption of palpable unfitness, as demonstrated by objective documentation of attending parenting classes."

The district court found that "[h]aving conceived a child a mere two months after their rights to seven children were terminated, there has not been sufficient time for [mother and father] to rehabilitate or change, evidenced by their refusal to acknowledge the neglect they showed their children." The district court noted that "[p]rior to the first TPR, [mother and father] received over 90 hours of in-home parenting education plus countless other services, yet [father] testified that the County never offered to help them and what was offered was worthless." Although the district court did not expressly find that mother and father failed to rebut the presumption of palpable unfitness, that finding is implied in its discussion of the palpable-unfitness presumption and finding that "[t]he evidence at trial showed clearly and convincingly that [mother and father] are palpably unfit to parent [T.T.]."

Caselaw recognizes that a parent is in a difficult position where the parent must rebut the presumption of palpable unfitness and the county is not obligated to make reasonable efforts to reunite the parent and child. *Id.* But caselaw also recognizes that there are ways for such a parent to demonstrate parental fitness and thereby rebut the presumption. For example, in *In re Welfare of the Child of J.W.*, 807 N.W.2d 441, 446-47 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012), this court found that a parent rebutted the statutory presumption of palpable unfitness where the parent testified and introduced the testimony of 14 witnesses that the parent had changed "in significant and material ways since the prior TPR proceedings."

In *J.W.*, the rehabilitation evidence included testimony that the parent had made significant progress in her parenting skills through parenting classes and dialectical

9

behavioral therapy, was "involved and active" in a parenting class, had conducted herself appropriately during supervised visits with her biological children, and had a more stable living environment than she had in the past. *J.W.*, 807 N.W.2d at 446-47. This court noted that the evidence the parent presented "was appropriately focused on her skills and behavioral tendencies at the time of the trial" and that the evidence "tends to prove that [the parent] has done more than merely engage in services provided by the county or a private social-service agency, and it tends to prove that her parenting skills actually have improved." *Id.*

In this case, mother presented evidence that she attended four parenting classes offered by four different providers for a total of 15.5 hours after T.T. was born. Mother testified that she learned appropriate discipline techniques, how to set clear boundaries for a child, and how to be a more assertive and supportive parent. Mother also testified that she and father had a two-bedroom apartment and that it was in good condition. She testified that they had a car seat, a changing table, and possibly a highchair, and that they had money to purchase other items for T.T. Mother also testified that she and father had changed, they had participated in marriage counseling, they had been learning how to make more nutritious meals, and they had identified potential daycare providers for T.T. Mother testified that she loves T.T. and her "heart's desire is to bring him home with [them]."

Mother's co-worker, H.W., testified in support of mother, stating that mother had significantly improved her attitude, mother had attended marriage counseling, mother

10

deserved a second chance to prove that she can be a good mother to T.T., and that it is "really unfair to take [mother and father's] son away when they haven't done anything."[2]

Mother presented significantly less evidence of improvement than the parent in *J.W.* Although mother attended parenting classes for three months after T.T. was removed from her care, she did not present testimony from her instructors regarding whether she was active and engaged in those classes or testimony from anyone other than father regarding improvements in her parenting abilities. And mother does not explain how 15.5 hours of parenting classes with four different providers could improve her parenting skills where her skills did not improve after 95 hours of parenting education in the last TPR proceeding.

Mother's evidence suggests that she may have been somewhat better equipped to provide T.T. with physical necessities at the time of trial in this case. But given the relatively short time period between the prior TPR and the current TPR, the neglect that mother's children previously experienced in her care, and mother's failure to accept responsibility for that neglect, mother's evidence was insufficient to show that she had changed in significant and material ways since the last TPR.

Most importantly, mother did not meaningfully accept responsibility for the neglect of her children. Instead, she minimized the harm that her children had experienced and generally defended her actions and father's actions. Mother downplayed the condition of the Glencoe home, admitting only that they "didn't have the cleanest house on the block," there "were cockroaches in the house," and the home had structural problems because it

---

[2] The district court noted that H.W.'s parental rights to her child were terminated.

was an older home. Mother blamed the city for the sewage backup in the home's basement. When the county's counsel asked mother how she thought living in the house affected her children, mother testified that she did not know "because we don't get to speak to them."

In addition, mother denied that she contributed to her children's failure to thrive, claiming that she and father fed the children and that "part of [their failure to grow] has to do with the genetics." Mother's position is inconsistent with the district court's finding in the prior TPR proceeding that the children were not provided with necessary food or nutrition and that one of the children told a social worker that he had difficulty eating at home because "cockroaches would fly in." Mother's position is also inconsistent with the district court's finding that initial genetic testing indicated that the children's growth issues did not have a genetic origin and that there was clear-and-convincing evidence that at least the youngest child's health issues were the result of inadequate nutrition and medical care.

On this record, substantial evidence supports the district court's findings that there had not been sufficient time for mother to rehabilitate or change and that mother refused to acknowledge her neglect of the other children. Moreover, mother did not acknowledge the harmful effect that the neglect had on the children. Under the circumstances, there is little reason to believe that mother will prevent T.T. from experiencing the type of neglect that the other children experienced. The district court therefore did not err by terminating mother's parental rights based on a determination that mother is palpably unfit.

## II.

Mother argues that "the district court erred by not allowing [her] an opportunity to demonstrate if she can parent overnight or without supervision," or in a supervised setting

outside of the artificially controlled environment of a VEC. Mother contends that "when a court relieves a county of providing reasonable efforts at rehabilitation, the court still has a duty to ensure that a parent is given an opportunity to demonstrate if they can parent overnight or without supervision."

As noted above, a social-services agency need not make reasonable efforts to reunify a parent and child where the agency establishes a prima facie case that "the parental rights of the parent to another child have been terminated involuntarily." Minn. Stat. § 260.012(a)(2), *see also D.L.R.D.*, 656 N.W.2d at 251 ("[T]he termination statutes clearly provide that when a parent has had parental rights to one or more children involuntarily terminated, the agency is not required to make reasonable efforts to develop a case plan and reunite the parent and child.").

The prior TPR order is part of the record in this case, and mother does not dispute that the county established a prima facie case that her parental rights to her other children were involuntarily terminated. The county therefore was not obligated to make reasonable efforts to reunite mother with T.T. or otherwise give mother a "meaningful opportunity" to parent. Mother does not cite authority indicating that she was entitled to additional supervised visitation, unsupervised visitation, or overnight visitation with T.T. to prove that she could parent him. Mother's reliance on *In re Welfare of the Children of B.M.* is unavailing because unlike the circumstances here, in *B.M.*, the county was statutorily required to make reasonable efforts to reunify. *See* 845 N.W.2d 558, 560-62, 565-66 (Minn. App. 2014) (reversing a TPR order where the county was statutorily required to make reasonable efforts to reunify parent with child and "[t]he district court made no

finding that reasonable efforts were undertaken by the county or that such efforts were unnecessary").

In sum, mother does not establish that the district court had a "duty" to ensure that she was given an opportunity to demonstrate her parenting abilities. In fact, that purported "duty" is inherently inconsistent with the statutory presumption of palpable unfitness and the lack of a reasonable-efforts requirement. And because the district court did not clearly err by finding that mother did not rebut the presumption of palpable unfitness, we affirm.

**Affirmed.**