*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1959
A15-1963**

In the Matter of the Welfare of the Child of: W. J. C., III, and G. A. C., Parents.

**Filed July 5, 2016
Affirmed
Reilly, Judge**

Carver County District Court
File No. 10-JV-15-183

Carol J. Mayer, Mayer Law Office, LLC, Arlington, Minnesota (for appellant G.A.C.)

Marla M. Zack, Anne Heimkes Tuttle, Tuttle Family Law & Mediation, P.A., Shakopee, Minnesota (for appellant W.J.C.)

Mark Metz, Carver County Attorney, Jennifer L. Christensen, Assistant County Attorney, Chaska, Minnesota (for respondent)

Dianne Schafer, State of Minnesota Guardian Ad Litem Program, Chaska, Minnesota (guardian ad litem)

Considered and decided by Smith, Tracy M., Presiding Judge; Worke, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REILLY**, Judge

Appellant-mother G.A.C. and appellant-father W.J.C. challenge the district court's order terminating the parental rights of both parents to their child, Z.K.C. Because a

statutory ground for termination exists and termination is in the child's best interest, we affirm.

## FACTS

Following trial, the district court made extensive and detailed findings of fact which are summarized here. G.A.C. and W.J.C. are the biological parents of Z.K.C., born in November 2009. G.A.C.'s custodial rights to her eldest two children were involuntarily transferred to relatives in January 2004 due to drug abuse, neglect, and domestic violence. In September 2009, Carver County Community Social Services (CCCSS) learned that G.A.C. was pregnant with Z.K.C. Because of the prior involuntary transfer of custody, CCCSS assigned the case to a child welfare and protection case manager (the case manager) for a child welfare assessment. The case manager visited appellants and noticed a strong smell of marijuana inside the home. The case manager was concerned about how small G.A.C. was, given the stage of her pregnancy. W.J.C. called the case manager the following day "screaming at [her], yelling at [her], and threatening to sue [her]" if she spoke to them or visited their home again.

Z.K.C. was born prematurely in November 2009 as a special-needs child, and the doctor was concerned about Z.K.C.'s health and development. G.A.C. and W.J.C. did not believe that Z.K.C. was a special-needs child. CCCSS filed a child-in-need-of-protection-or-services (CHIPS) petition due to concerns about appellants' history of substance abuse, their history of domestic violence and fighting, and their inability to care for a child with special needs. The case manager referred appellants to Connected Families to assist with

2

setting up a safety network and safety planning, and gave financial resources to assist appellants in providing a safe home environment for Z.K.C.

CCCSS social workers experienced difficulty meeting with appellants during this period. Appellants continued to abuse substances and engage in violent behavior. CCCSS created a safety plan for Z.K.C. which included a condition that appellants could not have drugs or alcohol in the home. W.J.C. did not participate in the majority of the meetings related to Z.K.C.'s safety plan, and appellants regularly cancelled appointments with the social workers. CCCSS closed the CHIPS petition without an adjudication in June 2010, despite ongoing concerns about appellants' ability to parent Z.K.C. or follow the safety plan.

In March 2010, CCCSS referred Z.K.C. to the First Step program to address Z.K.C.'s doctor's concerns about Z.K.C.'s developmental issues. An early childhood intervention teacher had difficulty scheduling home visits with appellants. The teacher visited the home in fall 2010 and noted her concerns about Z.K.C.'s developmental and cognitive delays. Shortly thereafter, G.A.C. moved out of the family's home but did not inform CCCSS about her new address. G.A.C. stated that she was moving because she was fearful of W.J.C., and testified to two domestic violence incidents where W.J.C. became physically abusive and hit G.A.C. Z.K.C. was asleep in his bedroom during these incidents. Appellants admitted to abusing alcohol and drugs during this period. Appellants continued to have domestic problems in January and February 2011, and W.J.C. petitioned for an order for protection on behalf of himself and Z.K.C. against G.A.C. and her then-boyfriend.

CCCSS again had contact with the family in March 2011, and identified appellants' case as one involving chronic neglect. A chronic-neglect case is a case that includes a child under the age of five in the family, with at least two previous reports of maltreatment, where one of the reports is substantiated or there is a determination that services are needed. CCCSS found that Z.K.C.'s circumstances fit the criteria for chronic neglect. CCCSS updated the family plan and performed an assessment interview. Appellants continued to abuse methamphetamine, and there were reports of domestic violence in the home in May and June 2011. W.J.C. and G.A.C. denied the reports and refused CCCSS entry into the home. CCCSS considered the risk-level to Z.K.C. "high," and noted that Z.K.C. looked "unkept," tiny, and was failing to thrive. CCCSS had 16 visits scheduled with Z.K.C. between March and September 2011, but appellants cancelled 6 of the 16 visits.

In September 2011, W.J.C. was arrested for domestic assault against G.A.C. for punching her in the face. Z.K.C. was asleep in the home. W.J.C. claimed that G.A.C. was using methamphetamine in front of Z.K.C. on the date of the assault, and found spoons and needles associated with drug use on the dryer. CCCSS received additional reports in October 2011 that G.A.C. was using methamphetamine at home in front of Z.K.C. and, during one incident, was unconscious on the floor for 12 hours. A neighbor heard Z.K.C. crying and broke into the home to find G.A.C. covered in her own vomit on the floor and Z.K.C. crying in his crib. A hair follicle test performed on Z.K.C. came back positive for cocaine and THC. While in the hospital, G.A.C. told CCCSS she was afraid W.J.C. was going to kill her. CCCSS removed Z.K.C. from his parents' care on October 12, 2011, and filed a second CHIPS petition alleging chronic neglect, due to his parents' behavior and

condition, the environment in which Z.K.C. was residing, as well as the severe and consistent use of methamphetamine by the parents. Z.K.C. was placed in foster care where he made progress, "looked healthier," and appeared "well kept." The district court adjudicated Z.K.C. as a child in need of protection or services in December 2011.

Z.K.C. was reunified with his parents in fall 2012 on a trial home visit. CCCSS continued to have concerns about Z.K.C.'s safety and stability because G.A.C. had a positive urinalysis, and CCCSS received reports that appellants were not complying with the terms of their court-ordered treatment. CCCSS set up a safety network and created a safety plan to ensure Z.K.C.'s safety so that he could be returned to appellants' care. G.A.C. testified that at that time, she had all the services and tools necessary to provide for Z.K.C.'s care. In January 2013, the district court closed the child protection file over the county's objection. At that point, Z.K.C. had been in the county's custody for 13 months.

In February 2015, CCCSS received a report that Z.K.C. had arrived at school with a mark on his cheek. Z.K.C. said that G.A.C. pinched and scratched him when she was angry. Z.K.C. also had a new mark on his forehead that was not there the day before. As of that date, Z.K.C. has missed 15 days of school, 7 of which were unexcused absences. The school reported that it had difficulty reaching appellants when Z.K.C. was absent. Due to the then-current reports of alleged physical abuse, the family's extensive child protection history, and reports that appellants were using methamphetamine again, law enforcement placed Z.K.C. on a 72-hour health and welfare hold. CCCSS filed a CHIPS petition on behalf of Z.K.C. and outlined its investigation. The petition alleged that Z.K.C. was in need of protection or services because (1) he was the victim of physical abuse, (2) he was

without proper parental care, and (3) his behavior, condition, or environment was injurious or dangerous to himself or others.

In April 2015, pursuant to an *Alford*-type plea, the parents admitted the allegations of the CHIPS petition. At the same hearing, CCCSS filed a termination of parental rights petition pursuant to Minn. Stat. § 260C.301, subds. (1)(b)(2), (4), (5), and (8) (2014). The district court found that "[i]t is in the best interest and safety of [Z.K.C.] for this matter to proceed to permanency. [Z.K.C.] has and continues to experience chronic neglect in [appellants'] care which has had a significant impact on his life." The order concluded that Z.K.C. "is a child in need of protection or services as it relates to the CHIPS Petition" and ordered Z.K.C. to remain in the care of CCCSS. A guardian ad litem (GAL) report from May 2015 noted that Z.K.C. was "functioning fairly well since his placement with no new concerning behaviors" and indicated that there have been "[n]o safety concerns since [Z.K.C.'s] placement in foster care and supervised visitation with his parents." At that time, according to county records five-year-old Z.K.C. had spent a cumulative 475 days out of his parents' care, or approximately one-third of his life.

Following trial, the district court concluded that clear and convincing evidence existed to terminate appellants' parental rights. The district court determined that four statutory grounds justified termination: (1) appellants substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon them by the parent and child relationship; (2) appellants were palpably unfit to be a party to the parent and child relationship; (3) following the child's placement out of the home, reasonable efforts failed to correct the conditions leading to the placement; and (4) the child was neglected

6

and in foster care and appellants' circumstances, condition, or conduct precluded reunification. Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5), (8). After making detailed and thorough findings of fact, the district court concluded that clear and convincing evidence supported each of these grounds and that "[i]t is in the best interest of the child that [appellants'] parental rights be terminated." Each parent filed a separate appeal, and this court consolidated those appeals.

## DECISION

Whether to terminate parental rights is discretionary with the district court. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136-37 (Minn. 2014). While a reviewing court conducts a close inquiry into the evidence, it also gives "considerable deference" to the district court's termination decision. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). The reviewing court will affirm the termination of parental rights if "at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the child's best interests." *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004); Minn. Stat. § 260C.301, subd. 1(b) (2014). The "best interests of the child" are the "paramount consideration" in a termination of parental rights proceeding. Minn. Stat. § 260C.301, subd. 7 (2014). A decision that termination is in the child's best interests is reviewed for an abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901-02 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

**Presumption of Palpable Unfitness**

Generally, a natural parent is presumed to be a "fit and suitable person to be entrusted with the care of his or her child," and the petitioner must prove by clear and

7

convincing evidence that a parent is palpably unfit. *In re Welfare of A.D.*, 535 N.W.2d 643, 647 (Minn. 1995). But "[i]t is presumed that a parent is palpably unfit to be a party to the parent and child relationship upon a showing that . . . the parent's custodial rights to another child have been involuntarily transferred to a relative." Minn. Stat. § 260C.301, subd. 1(b)(4). When the statutory presumption of palpable unfitness is established by a prior involuntary transfer of custody, the burden shifts to the parent to rebut the presumption by "affirmatively and actively demonstrat[ing] her or his ability to successfully parent a child." *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007) (quotation omitted).

G.A.C.'s parental rights to her eldest two children were involuntarily transferred and she therefore bears the burden of rebutting the presumption of palpable unfitness. G.A.C. argues that she actively engaged in supervised visits, parenting sessions, and court-ordered psychological evaluations. But G.A.C.'s participation in programming is insufficient to rebut the statutory presumption that she is palpably unfit to parent. A parent "must do more than engage in services and must demonstrate that his or her parenting abilities have improved." *In re Welfare of J.W.*, 807 N.W.2d 441, 446 (Minn. App. 2011) review denied (Minn. Jan. 6, 2012) (quotations omitted). Further, the "parent must affirmatively and actively demonstrate her or his ability to successfully parent a child." *Id.* (quotation omitted). The testimony does not elaborate on any skills that G.A.C. learned to enable her to provide consistent and ongoing daily care for Z.K.C.; superficial compliance with court-ordered services is insufficient to rebut the presumption. *See In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 543-44 (Minn. App. 2009) (finding appellant-mother

8

did not rebut presumption of palpable unfitness where her apparent willingness to cooperate with services and present herself in a better light was superficial). The district court found that "[e]ven in light of the extraordinary services that have been provided to [appellants], they have been unable to embrace change and sustain change to ensure [Z.K.C.'s] needs are being met."

G.A.C. further argues that she has demonstrated sobriety, has ensured Z.K.C.'s physical health, and has a stable home in a good neighborhood. However, the trial testimony reveals that appellants have a history of alcohol- and chemical-abuse, often associated with instances of domestic violence in the home. The district court detailed G.A.C.'s past and present chemical use and found that she "failed to embrace and utilize services to address [her] chronic chemical use and addictions." As the district court recognized, "[t]his is no environment for a child, and is illustrative of the neglect that [Z.K.C.] has suffered." At trial, a case worker with Families in Transition Services testified that she conducted approximately 43 home visits with Z.K.C. The witness testified that the visits generally went "well," but stated that G.A.C. appeared to be under the influence of chemicals during 2 visits, appellants were late to 19 visits, and appellants were ill or unengaged during 10 visits. A parenting attachment expert testified that the "home environment was extremely problematic," and that Z.K.C. was "fending for himself" and had not formed a secure attachment with his parents. The district court found this testimony credible.

"Whether a parent's evidence satisfies the burden of production must be determined on a case-by-case basis." *J.W.*, 807 N.W.2d at 446. Here, G.A.C. failed to present evidence

9

at trial that she has the skills to successfully parent Z.K.C. On this record, the district court did not err by determining that G.A.C. failed to rebut the presumption of palpable unfitness.

**Independent Statutory Ground for Termination: Neglect of Parental Duties**

A statutory basis to involuntarily terminate parental rights exists if one or more of nine conditions exist. Minn. Stat. § 260C.301, subd. 1(b). One such condition is when:

> [T]he parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including . . . providing the child with the necessary food, clothing, shelter, education and other care and control necessary for the child's physical, mental, or emotional health and development. . . .

Minn. Stat. § 260C.301, subd. 1(b)(2).

The district court found that Z.K.C. was "the victim of chronic neglect" in appellants' care, and clear and convincing evidence in the record supports this determination. As of trial, Z.K.C. had spent a cumulative 475 days out of his parents' care, or approximately one-third of his life. CCCSS social workers testified as to Z.K.C.'s condition prior to being placed outside of the home. CCCSS received 20 reports of Z.K.C.'s maltreatment, making him the "second most reported on child in all of Carver County." Z.K.C. experienced chaos, stress, exposure to illegal chemicals, and exposure to domestic violence in the home. Child protection workers testified that they performed home visits and were concerned about Z.K.C.'s developmental and cognitive delays. One witness described Z.K.C. as looking tiny and "failing to thrive." Z.K.C. did not meet his developmental milestones and was developmentally behind his peers, requiring speech therapy, occupational therapy, and physical therapy. Z.K.C. was not potty-trained at the

10

age of five, even though G.A.C. acknowledged that this impacted his ability to start kindergarten on time. Tellingly, Z.K.C. made significant improvements once he was removed from appellants' home and placed in foster care.

CCCSS witnesses also testified about their experience with appellants. Appellants failed to consistently obtain the services necessary to meet Z.K.C.'s needs. The CCCSS professionals expressed concern about appellants' ability to care for a child with special needs, particularly since appellants did not agree that Z.K.C. was a special-needs child. An attachment expert testified that "both parents said [Z.K.C.] has never been affected by abuse, neglect, or trauma when there was lots of collateral evidence to suggest that simply wasn't the case." The witness could not determine whether such a statement was "just blatant dishonesty or a total lack of insight and acknowledgment about how they've affected their son[,]" but testified that it had a long-term impact upon Z.K.C.'s health and well-being.

Appellants offer alternative interpretations of the testimony and argue that Z.K.C. was well-nourished, had stable housing, attended preschool, received regular medical attention, and was properly clothed. The factual record does not support appellants' contentions. Moreover, we give considerable deference to the district court's factual determination because the district court is in a "superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996). The district court heard testimony from CCCSS social workers that Z.K.C. was neglected, exposed to chemical-use and domestic violence, and was failing to develop. The district court found this testimony credible, and clear and convincing evidence supports the findings. *See*

11

*S.E.P.*, 744 N.W.2d at 385 (instructing appellate courts to conduct a close inquiry into the evidence, but to give "considerable deference" to the district court's termination decision). On this record, the district court did not abuse its discretion by ruling that appellants neglected to comply with the duties imposed upon them by the parent and child relationship.

**Reasonable Efforts Toward Reunification**

Appellants argue that the county did not make reasonable efforts to reunify Z.K.C. with his parents. *See* Minn. Stat. § 260.012(a) (requiring county to make reasonable efforts to reunify parent and child). The county claims it was relieved of its obligation because G.A.C.'s rights to her eldest two children were involuntarily transferred. *See id.*, § 260.012 (a)(4) (providing that reasonable efforts "are always required except upon a determination by the court that . . . the parent's custodial rights to another child have involuntarily transferred to a relative"). Appellants argue that the district court erred by failing to make specific findings that reunification efforts would be "futile." *See id.*, subd. (h) (allowing district court to find that further efforts at reunification would be "futile"). Here the district court did not make a finding that reunification efforts would be futile, but did make a finding that the county made reasonable efforts to reunify. Because those findings have substantial support in the record, we do not reach appellants' argument.

"Reasonable efforts at rehabilitation are services that go beyond mere matters of form so as to include real, genuine assistance." *In re Welfare of Children of S.W.*, 727 N.W.2d 144, 150 (Minn. App. 2007), *review denied* (Minn. Mar. 28, 2007) (quotation omitted). We review a district court's reasonable-efforts findings for clear error, *J.R.B.*,

12

805 N.W.2d at 901. In this case, the district court made findings at each hearing that CCCSS made reasonable efforts to prevent Z.K.C.'s out-of-home placement. In its April 2015 order, the court noted that the county provided ongoing case management services, partnership and ongoing collaboration with Z.K.C.'s school, child protection assessments, interviews and observations of Z.K.C., conversations with the parents, safety and support network meetings, safety planning, case planning, chemical testing, contacts with law enforcement, review of reports, kinship referrals, coordination and collaboration with treatment providers, and financial assistance to ensure Z.K.C.'s basic needs and access to resources and services were being met. The district court reiterated that CCCSS made reasonable efforts to prevent out-of-home placement and repeated these findings in its May 2015, June 2015, and July 2015 orders.

The testimony and other evidence presented at trial supports the district court's findings. CCCSS provided appellants with a number of services, including: parenting classes, supervised and unsupervised visitation, case consultation with agency staff and safety consultants, chemical dependency treatment, domestic violence counseling, marriage and individual therapy, coordination with pain clinics and medical providers, psychological evaluations and behavioral assessments, foster care, trial home visits, financial assistance, assistance with moving expenses, utility payments, daycare, budgeting, transportation, and medical assistance. CCCSS social workers began working with the family in September 2009, prior to Z.K.C.'s birth, and continued working with them until the time of trial. The record supports the district court's finding that the county

13

satisfied its statutory obligation to undertake reasonable efforts to reunify Z.K.C. with his parents.

Despite the county's efforts, appellants frequently cancelled appointments, failed to take advantage of the services offered to them, and refused to recognize that there was a problem. Evidence in the record supports the district court's finding that "ZKC had consistency as long as CCCSS was involved in providing services, but when the County was no longer involved, [appellants] were inconsistent with appointments and follow through." CCCSS social workers testified to their concerns that Z.K.C. was not getting the services he needed from his parents, who did not work on the assigned tasks from Z.K.C.'s occupational and physical therapists between visits or provide him with a safe home environment. The district court found that, "[a]s early as the initial CHIPs petition filed on behalf of [Z.K.C.], there [were] concerns and worries that [appellants] were not going to obtain the services necessary to meet [his] special needs, and [he] would fail to meet his milestones. Those same concerns continue five (5) years later." The district court's finding that the county made reasonable efforts to reunify Z.K.C. with his parents is supported by clear and convincing evidence in the record.

**Case Plan**

Appellants argue that the termination of their parental rights is defective because they were never given a written case plan. A written out-of-home placement plan must be filed with the district court within 30 days after a child is placed in foster care. Minn. Stat. § 260C.212, subd. 1(a) (2014). The plan must describe the specific actions the parents can take to eliminate or correct the problems which led to the child's placement in foster care.

14

*Id.*, subd. 1(c). A written case plan is required in every case. *In re Matter of Welfare of Copus*, 356 N.W.2d 363, 365-66 (Minn. App. 1984). However, the county's failure to file a case plan is not reversible error in the limited circumstance where the parents' own lack of cooperation prevented the county from constructing and providing a written case plan and the evidence shows the parents were informed of the expectations. *In re Welfare of R.M.M. III*, 316 N.W.2d 538, 542 (Minn. 1982).

Here, the case worker provided case-planning services to appellants and drafted a preliminary case plan. The case worker scheduled an appointment to meet with appellants and their previous CCCSS case worker to have a "hand-over" meeting with the family. G.A.C. cancelled the meeting, and the case worker had difficulty rescheduling with appellants. Overall, the case worker testified that it was "very challenging" to meet with appellants to update the case plan, and it was difficult to "provide the full scope of case management services when there's little engagement from the families." As a result, the written case plan was not finalized or filed with the district court.

However, this record demonstrates that district court orders adequately informed appellants of the county's expectations, and that a finalized case plan would not have provided additional guidance. *See In re Welfare of J.J.L.B.*, 394 N.W.2d 858, 863 (Minn. App. 1986) (affirming termination where lack of timely filed case plan was partly due to parent's lack of cooperation and prior court orders adequately informed the parent of what needed to be done before children could return home), *review denied* (Minn. Dec. 17, 1986). In its April 2015 order, the district court stated that "[t]he parties agree and the Court finds the case plan that is outlined in the Order of this matter is appropriate and is in

15

the best interest of the child." The district court ordered that: appellants shall cooperate in the development of a case plan, W.J.C. shall complete a treatment program and a domestic abuse assessment, G.A.C. shall have an updated psychological assessment, parents shall participate in parenting classes and coaching sessions, parents shall abstain from mood-altering chemicals including alcohol and submit to random chemical testing, and parents shall participate in safety planning and the development of a safety and support network for Z.K.C. The district court repeated these detailed case plan elements, sometimes with some updated conditions, in its May 2015, June 2015, and July 2015 orders.

We are aware that statutory authority provides that "[a]n out-of-home placement plan shall be prepared." Minn. Stat. § 260C.212, subd. 1(a). Under the canons of statutory construction, the word "shall" creates a mandatory duty. *See* Minn. Stat. § 645.44, subd. 16 (2014) ("'Shall' is mandatory."). Section 260C.212, subdivision (a), however, does not preclude termination of parental rights if a county fails to provide a written case plan. Therefore, we will not assume that a failure to provide a case plan is automatically fatal to a termination. *See generally, Hans Hagen Homes, Inc. v. City of Minnetrista*, 728 N.W.2d 536, 541 (Minn. 2007) (noting that statutes can use "shall" "in two different contexts[,]" distinguishing "shall" when a statute uses the word in its mandatory sense from a statute that uses the word in its directory sense, and stating that the court could not "imply from the word 'shall' that there would be specific but unexpressed consequences for noncompliance with a statute"). Indeed, caselaw informs us that in rare cases, the failure to finalize a case plan does not warrant reversal where it would be ineffectual. *See Copus*, 356 N.W.2d at 367 (noting that such situations will "rarely be present").

16

Here, appellants were informed of the conditions they were required to satisfy in order to effect a reunification with their son. The district court clearly articulated the case plan elements with appellants each month between April and July 2015 in its written orders. This evidence contradicts appellants' arguments that they did not know what was expected of them, and renders harmless any failure to provide a written case plan. *See In re Welfare of S.R.A.*, 527 N.W.2d 835, 838 (Minn. App. 1995) (refusing to reverse a termination of parental rights for technical defects when outweighed by child's best interest), *review denied* (Minn. Mar. 29, 1995). Moreover, the district court found that "CCCSS provided significant [c]ase planning, but it was difficult to provide the full scope of planning when there was little engagement from the family." The CCCSS case worker discussed the case plan with appellants and they "could not identify any services that they believed would be beneficial to them." As the district court noted, neither the county nor the court can "force parents to engage in services that they are not willing to engage in." We therefore determine that this is the rare case where the lack of a finalized case plan does not require reversal.

**Best Interests of the Child**

An appellate court will affirm a district court's termination of parental rights if "at least one statutory ground alleged in the petition is supported by clear and convincing evidence and termination of parental rights is in the child's best interests." *In re Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008) (citations and quotations omitted). The child's best interests are the paramount consideration in a termination proceeding. Minn. Stat. §§ 260C.001, subd. 2(a), .301, subd. 7 (2014). A best-interests' analysis requires

17

consideration of the child and parent's interests in preserving the parent-child relationship and of any competing interests of the child. Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3); *see also J.R.B.*, 805 N.W.2d at 905 ("Competing interests [of the child] include such things as a stable environment, health considerations[,] and the child's preferences." (quotation omitted)).

The district court's best-interest finding is well-supported. Z.K.C. was five years old at the time of trial and spent a cumulative 475 days out of his parents' care. The district court found that while appellants love Z.K.C., "they do not have the ability to place [Z.K.C.'s] needs ahead of their own. If [Z.K.C.] were returned to [appellants'] care, [he] would continue to fall behind, continue to be absent from school, and continue to be exposed to the chemical use and domestic violence that exists in the . . . home." These findings are supported by the record given appellants' well-documented history of chemical abuse, domestic violence, and chronic neglect of their child. *See R.M.M.*, 316 N.W.2d at 542 (affirming termination where parent's inability to care for child "threatens the mental and physical health" of the child); *see also In re Welfare of A.J.C.*, 556 N.W.2d 616, 622 (Minn. App. 1996) (affirming termination of parental rights where "in spite of [mother's] love for her children, [she] has failed to comply with her parental duties, basically due to her personal problems of alcoholism, drug addiction, low self-esteem, and her tendency to involve herself in abusive relationships").

Termination will allow Z.K.C. to be adopted into a family that can meet his needs for a safe, stable, and permanent home. The district court did not abuse its discretion by determining that termination of appellants' parental rights is in Z.K.C.'s best interests.

Because a statutory ground for termination is supported by clear and convincing evidence and termination is in Z.K.C.'s best interests, we affirm the termination of appellants' parental rights to Z.K.C.[1]

**Affirmed.**

---

[1] W.J.C. argues that his due-process rights were violated due to ineffective assistance of counsel. Specifically W.J.C. argues that his trial counsel did not object throughout the proceedings to the district court's findings that the county made reasonable efforts. W.J.C. did not raise this argument below and we decline to consider it for the first time on appeal. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (noting appellate courts will not consider matters not argued to and considered by the district court). Moreover, an appellate court "will generally not review an ineffective-assistance-of-counsel claim that is based on [litigation] strategy." *Andersen v. State*, 803 N.W.2d 1, 10 (Minn. 2013). Further, for an appellate court to grant a new trial based on ineffective assistance of counsel, W.J.C. would need to prove that counsel's representation fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceedings would have differed. *Gates v. State*, 398 N.W.2d 398 N.W.2d 558, 561 (Minn. 1987). There is a strong presumption that counsel's performance was reasonable, *Anderson*, 803 N.W.2d at 10, and on this record, W.J.C. has failed to meet his burden that if his counsel had objected, the outcome would have been different.